Good morning. I'm Kira West and I represent one of the appellants in this case, Mr. Omar Steele. This case presents an opportunity for the Fourth Circuit to remind law enforcement wiretapping an individual's personal telephone is an investigative tool of last resort. This case also presents an opportunity for this court to remind the prosecution team of what's required of them under Brady v. Maryland. In that vein, Mr. Omar Steele was not given a fair trial. His due process rights were violated when he was not able to recall two witnesses in this case. But first, the wiretaps. The wiretap statute gives us more than the Constitution even. Whether or not to wiretap someone's phone must be looked at through the crucible of not only the Constitution but also the federal statute, section 2518 subsection 1c. In the old days, we prosecutors called this probable cause plus. What does that mean? It means that the affidavit must supply the district court who's reviewing this affidavit not only probable cause but a full and complete statement that spells out the necessity for this wiretap. And this is where this case runs into trouble. The statute requires the defiant to tell the district court that investigative tools have been tried and failed or they reasonably appear likely to fail. They won't succeed if they're tried or they are too dangerous to employ. An adequacy of this showing... With respect to this affidavit, as I understand it, the affidavit said that there were no confidential informants. Yes, Your Honor. Which is one of the ways in which the drug conspiracies are usually cracked. And the point was made that Mata's girlfriend wouldn't... well, they'd hoped to use Mata's girlfriend, I guess, as a CI. Well, that's not exactly correct, Your Honor. They didn't hope to use her. I thought we had been recently arrested and was no longer available to use as a CI because Mata was aware of it. Well, I'm not sure confidential informant would be the right term. I think cooperating defendant because she was charged with possession of the drugs and the money that she was carrying in her car that day. But what's important is they didn't even try. They arrested her and her daughter. They took the drugs and the money and they dropped it. There wasn't even a two days later, let's go see if she's still in contact with Mata or let's follow her. Now that we've identified her, we know where she lives, we know what her car is. They also searched her home. It was dropped. And that's the road that the problems arise in this case with the agents. What they ask for, for necessity, is exactly as what you just said, Judge Wilkinson. Confidential informants, trash pulls, whole cameras, surveillance. That's an investigative tool, a traditional investigative measure. But didn't the affidavit address the surveillance when it said that the physical surveillance would not be sufficient because Mata had put in place counter-surveillance practices and they really didn't have in the places they wanted to surveil a place to mount the cameras? Well, what's interesting about that is... But wasn't that in the affidavit? It was, but it wasn't a, quote, full and complete statement. And here's why. It said that Mata did counter-surveillance measures when they followed him. But here's what's interesting about that. It didn't say how he did it, where he did it, what date he did it, exactly where he did it. It also said in the affidavit, he ran stop signs and red lights. I think this is going to be in the affidavit for Target Telephone Deep. Interestingly, it doesn't say the stop sign at 5th and Connecticut or the stop sign at, you know, and it doesn't say what date. It just says he did it. And this is what... I thought that there were five different reasons in this affidavit as to why other methods, confidential informants, surveillance, control buys, would be unavailing. And I wanted to ask a question with respect to these... With respect to the wiretap. The point is often made that if you start to get too strict with law enforcement officers on the warrant affidavit, that they're going to look for shortcuts around warrants and start to do things without a warrant and press exceptions to the warrant clause. And I wonder if... I mean, people... Law enforcement's capable of engaging in a lot of subterranean practices and I wonder if you, you know, say, well, this and that and the rest is insufficient in an affidavit like this. And whether we may be moving in the direction of more warrantless wiretaps, some of which, you know, may never come to light, but which may lead to other evidence. And so, I'd like to tie law enforcement to the judicial process as much as possible, and I'm wondering whether your position doesn't push it away. Say, oh no, they'll submit more complete affidavits, is always their response. But honestly, isn't it... Is there danger here? No, I agree with the court. I think that law enforcement should be totally tied to the judicial process. I think that's spectacular. What bothers me and what my point is for Mr. Steele is that it wasn't done in a particularized way. The statements in the affidavit your honor is discussing were such that it was just a boilerplate statement. This is how it happened. Whereas the other Fourth Circuit cases that recited in the government's brief, they were distinguished in that the things that law enforcement did in those cases were tailored specifically to the case. For example, the Oriaki case was the Nigerian heroin ring. The affidavit gave detailed descriptions on how they exhausted reasonable alternatives. You, Judge Wilkinson, asked about poll cameras. All the affidavit in this case said was, we can't use one. It didn't say, because of the way the apartment complex is located, a poll camera can videotape up to half a mile away. You don't really read the affidavit as conclusory, do you? Well, you have to... You do. You have to say in your affidavit, here's the things we tried and they didn't work. For example, trash pulls. He said, we can't do trash pulls because somebody might see us or a neighbor might see us. Let's pick up on that last point. You say you've got to try them. But I wonder, the affidavit made the point that the control buys would be dangerous to try. I mean... That's the nature of law enforcement. That's true in every drug case. But you don't... Right. But you don't send people into situations for a control buy, you know, whether they're going to be shot or hurt. I mean... They do it every... DEA does it every day, Judge. Maybe so. But it's a dangerous game out there. And the control buys aren't always made by DEA agents. Correct. And that's why, if the control buy doesn't work, let's try surveillance. Let's try something else. And along those lines, I see that my time is ticking away rapidly. It's ticked away, but you have... Well, I have seven minutes. ...the amount of time, so I wish you would continue. Yes, sir. What's interesting in segues next is that one of the things they can do is use a dog, like we had in this case, Pele. And that's one of our points, is that Mr. Steele was not given a due process or a fair trial. I was asking on cross-examination a question that was beyond direct. And I, because of my past experience with drug cases, knew that if a dog handler did a scan somewhere, there was a report. I hadn't been given any. The other defense lawyers in this case hadn't been given any. And when I got that report initially, the prosecutor gave me one page and said, here's the dog handler's report, and you can cross-examine on that. And I did. And that was the end of it. The next day, the prosecutor handed me 13 pages. But I thought your point was that the dog would have... that there was a long... I thought there was a long lapse of time between when the latent drug odor was in the car and when you expected the dog to alert. I mean, these dogs are not infallible. But no, that's correct. And the problem was, I wasn't able to call the dog handler back, because he's the person with the experience who could answer that question. Is the court conceived... But wasn't your point in calling the dog handler back that the dog should have alerted months after the particular drug odor was in the car? That's quite some dog. Well, it can be years after. And that's why I needed Mr. Margolis to come back and testify, because he's the one with the knowledge of that. And we weren't able to do that. And it's very problematic to go down the road of, we're not going to give you this because it's exculpatory. And of course, there's lots of other evidence. Well, let's talk about that. Let's talk about that. There's other... Can you... If I might, if I have the permission of the court. You do. You know, we have three defendants here, and that leaves you so limited time. I'm supposed to have seven minutes, and I think I'm probably right at it. You should have some additional time. Go ahead. Thank you. I appreciate it. All right. Well, she's going to have some additional time. I appreciate that, Your Honor. The problem is, that's why I wanted to call the dog handler back, because those people who deal with those dogs day in and day out, year after year, have a specialized knowledge that I would have been able to cross-examine him on. I know that you can... A dog can sniff on a car two years later if there's been... That dog's trained in cocaine, heroin, and everything. I know that. That's what I want to ask on cross-examination. But I was unable to do that. I had to ask the same guy who wrote the affidavits in this case, Detective Marmegos, and he said, I don't know. I'm not a dog handler. What did that get Mr. Steele? It didn't get him a fair trial. The defense side is taking aim at the fallibility of the dog. You're building this dog into a superhero. I'm a dog person. So, when you put this, there's no reason for the prosecutor not to give defense counsel a report that this dog handler's made. By the time I get it and look at it, which is, I'm in trial, I own that. I should have looked at it more carefully the day she gave it to me, which was a Friday. I didn't bring it up until the next week, and I own that. But the other problem is, when you put this together with the translator, we're going to give you four different sets of transcripts. And by the way, here's the last set while you're picking the jury. And the district judge says to me, well, Ms. West, you've had a day and a half to look at that. You had an opportunity to cross-examine him on that. It was a world unto its own, I must say. What about the surveillance footage that showed Steele doing drug deals in New York? Doing drug deals. That's their theory. All it showed was that Steele was in New York. It didn't show that he was doing drug deals. The only person who identified Mr. Steele in New York was, guess who? Their star witness, Mr. Mata. I called DEA agent, and that, if you read the record, was really something, trying to get him down here from New York to testify that he had the eye, as we call it, on surveillance. He couldn't identify that Omar Steele was in that Black Infinity. The only person who could do that was Mata. And he's one of, you know, their star witness. Isn't that a great closing argument? I think I gave a good closing argument. It didn't work. It was a good closing argument. Well, not only that, this is a ginormous drug case. There's no photographs of him picking up drugs, delivering drugs. There's no drug evidence in his house. There's none in his car. There were the recorded phone calls. There were recorded phone calls. And I'm not going to stand here. Negotiating the drug deal. I'm not going to stand here and tell this court my client didn't know anything about drugs, because he did. He did. But the, and that's why calling that interpreter was so important. How do you, what did this mean? What was in these recorded phone calls? The whole theory of the government was, my guy's a multi- A lot of drug paraphernalia, wasn't there? There was. Here's what's interesting. DEA never followed my guy to that apartment. There's no evidence that he was in that apartment. Isn't this beginning to mount up? It's not. It's, and here's the thing. In a criminal case, the burden is beyond a reasonable doubt. We're not even clear and convincing in this case. And that's what I argued in my closing argument. All DEA had to do was follow that car, watch him go up to the apartment and watch him go in. Or put a poll camera. Or get a confidential source who needs some heroin or cocaine. That's easy to do in the D.C. area. And send somebody in. There's not even a photograph of my client and Mr. Mata doing anything together. And that's the dearth of evidence in this case. Let me ask if there's some further questions. We thank you. And I think you've reserved some rebuttal time as well. You've been awfully kind to indulge me. Thank you, Your Honor. Well, no, it's, I have some sympathy for situations where they're multi-defendant appeals. And people don't get a fair chance, really, to make their arguments. Mr. Martin, we're pleased to hear from you, sir. Thank you. And may it please the court, counsel. She's a tough act to follow. Here and in court as well. Your Honor, I'm going to be brief. My issue is a real easy one. And it has to do with whether or not the judge erred in denying us the instruction on multiple conspiracy based on a variance of proof. I want to start by talking a little bit about Mr. Mata. Because I think you have to understand the nature of this character. He was not only a drug dealer, but he was quite deceptive. And I don't mean just in terms of lying. Because he was very good at that. So you're saying there are multiple conspiracies? Right. I'm saying there are multiple conspiracies. And I'm trying to explain why by giving you an idea of the kind of person Mr. Mata was. He would keep the people who were working with him in his various activities in the dark about what anybody else was doing. So in other words, he had this activity taking place from New York to Washington, D.C. Mr. Medrano had absolutely nothing to do with that. That involved, if you believe the government's theory, heroin. But isn't the conspiracy tied together through Mr. Mata? I mean, he is the one that is... It's a very large drug operation as far as I know. It's dealing with heroin and cocaine. But Mr. Mata is the head of all the activities. And people are working in his direction. And they're reporting to him. And it's very often the case that a head of a drug conspiracy doesn't want everybody else to know what everyone else is doing. Part of control is to have the knowledge yourself and not to share it with everyone else. At least that seems to be the way that a lot of these kingpins operate. And I'll concede that point because that's an accurate statement. And I can't dispute that. But if you take the hub-and-the-spoke analysis, the problem with this is, as is so often the case when we argue multiple conspiracies, there was no rim. And let me explain to you. Let me give you an analogy. If somebody owns a liquor store and they have a dealer who's selling whiskey and his trucks bring the whiskey. And you have another dealer who's selling rum and he brings his trucks in. And you have yet a third one who's selling Anheuser-Busch beer. The three of them have absolutely nothing to do with each other. They don't even know each other. The trucks don't pass each other. They're dealing in three different products. And that's exactly what we had here when you talk about Noé Medrano and Omar Steele and Mr. Barahona. Everybody's doing something different. Was that brought before the jury, the single conspiracy question? Well, the question wasn't able to be argued because we were denied the multiple conspiracy instruction. I asked for it and it was denied. I'm not sure you're denied the right to argue something just because the judge doesn't instruct on your theory of defense. You can still argue it. I'm not saying you should have or would have. But it doesn't follow that the denial of the instruction precludes argument. Doesn't have the same force without the instruction. I may very well have made the point that Mr. Mata was dealing for a different product.  And what I don't want to do is make a misrepresentation. You wanted to be able to say as the judge instructed you. Exactly. My client might be involved in a conspiracy, but it's not the one charged here. Exactly. And without that instruction, you didn't want to say that to the jury. I didn't want to, or even if I did, it didn't have the same force. And my argument is he didn't have the substantial defense that we would have liked him to have had. And one day, and I'm hoping you find that this is the case, but one day I'm going to get a multiple conspiracy case that's going to fly. And I'm hoping that this is the one. I really didn't get to talk to you much about Mata. My time is almost up. You need to know, though, he kept everybody in the dark. He lied to everybody about what they were doing, what kind of drug they were carrying, the quantity of drugs they were carrying, who the couriers were. The great kingpin. That's the hallmark of a great kingpin. Well, and I think that's also the basis for an argument that there was a multiple conspiracy here. My guy was a drug addict with respect to powder. He had nothing to do with heroin. He never made a trip to New York. He knew nothing about- Every time we have a large conspiracy council, it's always multiple conspiracies. But I don't think the one follows from the other, does it? I mean, we have a large conspiracy here, but- Well, well, the multiple conspiracy claim is always going to be fact specific. It's always going to turn on the circumstance and the evidence in a particular case.  there was a variance in the proof. The indictment said that Mr. Medrano was involved in a conspiracy to distribute cocaine and heroin. And there was no evidence that Mr. Medrano had anything to do with heroin. And I understand that when something is in the conjunctive the way it is like that, the courts allow that. But I think it's wrong. I think that he should have been specifically charged with dealing with heroin in a separate count. When you put the two together like that, we should have been entitled to argue that there was a variance in the proof and get an instruction on multiple conspiracy. And the judge, he decided not to do that. And I believe he erred to the detriment of Mr. Medrano. Thank you. Is there anything further you wish to add? Nothing further. Thank you for your patience, for your attention. Appreciate it. Mr. Mata, we're happy to hear from you. Thank you. Good morning, Your Honors. I represent Mr. Francisco Barona. And I'd like to present argument this morning relative to the sentencing enhancement that was applied by the district court judge in this case. At sentencing, the judge applied the enhancement for possession of a weapon by a co-defendant by possession of the weapon was by Mr. Mata. And he applied the enhancement under 2D1.1B1. We submit that that was an error, that there was insufficient evidence to support such an enhancement. Now, application note 11A addresses as well the enhancement. And it states that if a weapon is possessed, the enhancement applies unless it's clearly improbable that the possession of the weapon was pertained- What's the standard of review here? Clear error, Your Honor. Clear error standard? Sorry? It's a clear error standard under a reasonable foreseeability test. Correct. But we asked the court to find here that there was error. Yes, it is a reasonable foreseeability test. But one of the points that the court must also consider is, as application note 11A states, the question is whether the application applies unless it's clearly improbable that the weapon was used in conjunction with the offense. And it's our argument that the weapon actually was not used in conjunction with the offense. There was testimony by Mr. Mata himself about the purpose of the weapon and why he had that weapon. And he stated that the weapon was not for his daily drug dealing. It wasn't to protect the drugs that he had on his person or medical- Can I ask you just a sort of common sense question I had? Certainly. How is it even conceivable that anybody in this conspiracy didn't know that Mata had possession of a firearm? I mean, is it really possible to think that Mr. Mata just went around in this dangerous world in which he operated and he didn't have any firearm either on him or quite available for his protection? And the district court was clearly erroneous in finding- Well, I would say as to Mr. Barrona's thought process, yes. And I say that because Mr. Barrona was also, according to the government's evidence, an integral part of this conspiracy. According to the government, Mr. Barrona had three roles in essence. He was a transporter of large quantities of drugs. He allowed Mr. Mata to use his residence to store large quantities of drugs. And he also, although he had legitimate work, he was also supposedly selling on the side some of the drugs from Mr. Mata. But he did not have a weapon. There was no evidence that Mr. Barrona himself had a weapon. Right, but this would be a first in the history of drug organizations if Mr. Mata was not. Well, but Your Honor, it's a rebuttable presumption. And therefore, I mean, there is possibility that there are cases where there is no weapon. Otherwise, it wouldn't be a rebuttable presumption. Otherwise, it would be required in every case. Well, maybe so. But you know, there was a nine millimeter gun. Right. And found and discovered in the truck that Mata was driving to Barrona's home. Right. He drove that truck to Mr. Barrona's home. But what's also interesting is that there were other defendants in this case who were much closer in relationship with Mr. Mata and actually were physically with Mr. Mata the day that that weapon was recovered. And they didn't get the enhancement. So somehow it's foreseeable to Mr. Barrona. But it's not reasonable, foreseeable to those individuals, which just shows that it's that this enhancement is being used. That's intensely factual, is it not? It's being used. And excuse me, Your Honor, it's being used. Intensely factual? Be right up a district judge's alley? I'm sorry. I mean, that's if it's all I'm trying to say is, is I hear you, but isn't it all a factual determination? Well, it is. But factually, those two individuals were much closer to the weapon. They were there, in fact, the day that Mr. Mata had that weapon. His wife, Lorena Chavez Lunas. All right, this trial lasted a month. Yeah. It was a month-long trial. District judge listened to all that testimony. You think that he might have had a little bit better view of who understood what and what was foreseeable to whom than we do? Right. I mean, he's lived with the case for a month. Right. But, Your Honor, and that's where the error is. He lived with it for a month, and yet he did not find that Solorio, Gordo Solorio, who accompanied Mr. Mata that day to Mr. Barona's residence, who had his hands in that very truck where the weapon was found, taking drugs out of that truck. He was with Mr. Mata when he was arrested that morning, and Mr. Solorio did not get that enhancement. His wife, she came... So, maybe there was an error there. Maybe he should have gotten the enhancement. But how does that help your client? Well, I... I mean, are there cases that say that... Do you have any cases to cite in support of the proposition if someone else didn't get the enhancement who arguably deserved it, that means the remedy for that is that we get rid of the enhancement in your case? No, I guess not. You're right. That's correct. That could have been an error for him, and yet why should it... Right. I understand. But it just goes to the arbitrariness of the way the enhancement is applied. Okay. I do think there's also... I mean, in this case, Mr. Barona wasn't anywhere near where the weapon was recovered. He was out at work that day, and the only reason he came back to his residence that evening around 4 something was because police were there at that point, and they had asked his daughter to call him back. And so, he was nowhere near the residence. He was nowhere near that truck. There was nothing to tie him to that truck. Certainly, in the evidence, there was nothing indicating that Mr. Barona had ever seen Mr. Mata with a weapon or any of the other co-conspirators with weapons. There was no evidence that Mr. Barona had ever heard or had conversations with Mr. Mata or any of the co-conspirators about weapons. There was no violence involved in this, so there was nothing to him to show that Mata had upped the ante of just drug dealing to walk around with a weapon. But again, the purpose Mr. Mata set of carrying the weapon was not for his everyday drug activity. He said he had been threatened. Now, I understand he'd been threatened. None of this made any difference to the sentence, did it? It would, though, at this point. Well, because now the... So, the guidelines at this point... Originally, Mr. Barona's guideline offense level was a level 34 based on drug quantity. At this point, it would be down to a level 32, I believe, because of the amendment. Didn't the court sentence him way below the guideline? The court did, but... So, the court has... Even if it was error, you think you'd get below 132 months? We might very well, because... What's the basis for that? Well, because at this point, the guideline range without the gun bump and with the amendment downward in terms of the drug quantity, Mr. Barona would be looking at a guideline offense level 32, criminal history one, which is 121 to 151 months. So now, the sentence that was imposed, not only is it within the guideline range, but there's a, even within the guideline range, a lower sentence. We were asking for a 10-year, 120-month sentence, and... Which the judge decided on 11. Right, but I think... You think he'd really go to 10 just because... Well, he might... We say he wrongly tagged him with the gun? I think he should be given that chance now, because now he's no longer looking at the gun as being involved. No, he's still looking at the gun being involved. I understand. I mean, if the court here were to find that he erred in terms of applying that application. But then the point is, I mean, the guideline range would be at a different level. And in fact, the sentence of 10 years is just really one month below the guidelines. And so, yes, I think we should give the court a chance to then determine what the sentence would be. All right, thank you. All right, thank you. Your Honor, may I please the court? Scott Meisler on behalf of the United States. Unless the court has any preliminary questions, I would just address the issues that Appellant's counsel raised during their presentation, starting with the wiretap evidence. You don't need to repeat things. We've already been over. Right, I guess I just wanted to clarify just a couple of quick record points on a couple of matters that Ms. West represented about the explanation in the first affidavit. And again, Ms. West was referring to a single affidavit, but there are numerous affidavits in this case. And the first one I'll address is Target Phone C, the first wiretap of one of Mr. Monto's phones. Our position below and here is that Mr. Seale actually doesn't have standing under the statute to raise that. But because one of the defendants at least does have standing, I'll just refer to that affidavit. I just wanted to point the court to a couple of places. And one is on Joint Appendix 1811, when Ms. Seale says that the counter-surveillance described there wasn't specific. It didn't refer to dates. In Target Phone C, Joint Appendix 1811, the counter-surveillance was described as taking place on September 27, 2011. The next affidavit that's relevant here, Target Phone E, Joint Appendix 2000 and 2001, refers to November 14, 2001, counter-surveillance techniques that the agents observed. So they were continuing to try physical surveillance throughout. They later were able to use a poll camera. They later were able to conduct trash pulls. And when they weren't able to do so earlier, they explained why that was. Initially, because Mr. Monto lived in a common development at a common dumpster, and one of his suspected drug suppliers lived there also or was seen there. And so it could be an extra pair of eyes to alert his presence. This wasn't boilerplate. And I would urge the court to look at the Galloway decision we cited, which came down after the appellant's brief was filed, but before the government's brief was filed. I think Galloway, which also is a Maryland case involving a Baltimore drug investigation, lines up very favorably with this case. The description in the court's opinion is almost exactly what the affidavits in this case show. And again, the court's standard review here, since the Wilson case, is abuse of discretion. The court is reviewing the issuing judge's decision for abuse of discretion. In the light of this court's precedents and the extensive nature of the descriptions in the affidavits, we do not believe the appellants have shown an abuse of discretion. On, I'll skip ahead to the multiple conspiracy. I'm sorry, just before you leave wiretaps, just on the standing question, right? So you, the defendants, you have a dispute about whether anyone has standing to challenge that very first tap, right? That's correct. Target Phone A, which was not of any of the defendants in this case, that was of someone named Kevin Walker, wasn't charged in the conspiracy in this case. And in your brief, if I'm remembering right, all you argue is that there is no standing. On Phone A. That's the only argument we've made. The district court didn't, Ms. West, I think is correct in reply to say the district court didn't make an explicit standing finding as to the wiretaps and found, rejected the claims and the merits. But again, I don't think that the government's response below didn't address Target Phone A. So I don't think the district court was ruling on that in light of the absence of a response by the government. I'm sorry? What's wrong with just going to the merits, those standing issues in this gray zone? I think we don't, we don't dispute it. I mean, as to Target Phone A, again, the record is not as developed. Target Phone A, the affidavit is in the record. We have no problem standing on the affidavit on its face. My understanding of the defendant's claims below and here was that the major infirmity in Target Phone A was failure to detail confidential informants. But again, I think if you look at Target Phone, the affidavit for Target Phone A on its face, I believe it's J2709. It's the last thick volume. It describes extensively the confidential informants. It doesn't reveal their name, but it reveals why the police believe them to be trustworthy, who was cooperating because they've been arrested, who had been paid by the government as a CI. So we have no problem with the court addressing the merits. I think it would be quite novel for the court to do so because again, since the 70s, it's been settled that you can't have derivative standing just because- We can skip over that, right? This isn't like Article III standing, right? We don't have to address it. Exactly, Your Honor. It's statutory standing. It basically arises from the definition of a grieved person in the wire stab statute. So that's exactly correct. You don't have to address it. On the multiple conspiracies claim, two points I wanted to make is just that we believe under this court's Nicolau decision and federal rule of criminal procedure 30D that the proper standard of review is plain error. It's true that the defendants in their initial instructions prior to trial requested a multiple conspiracy charge. They didn't renew that or object at the end of trial. And this court's Nicolau case held that you have to do so. And I think it's not being nitpicky. There are reasons for that. As Judge Wilkinson pointed out, this was a month-long trial. The trial judge is going to see how the evidence plays out. He's going to see whether the defendants have put something in the record to make out a multiple conspiracies charge. So there is a reason to require that that charge be renewed or that the absence of a charge be objected to before the jury instructions are finalized. Do you think plain error review applies here? But under any standard- It wasn't error at all. It wasn't error at all. I think- Because there wasn't enough evidence to put it in play. I would agree with that, Your Honor. By means of an instruction. I agree, Your Honor. I think the easiest way to look at that in terms of explaining why this case shows the interdependence of participants that are the hallmark of a chain drug conspiracy is just to look at the days preceding the final Atlanta drug run in late January of 2012. You have drugs brought in to Maryland by Stotts, whose nickname was Ranko, who had been brought into the conspiracy by Defendant Medrano. At the same time, you have Mr. Matza making phone calls to Medrano and Mr. Steele, the defendants, trying to figure out what their next order from that shipment of drugs is going to be. And of course, the drugs are brought to Defendant Barahana's home where they're supposed to be stored, and at least as to the cocaine cut for redistribution. That shows everything coming together in one moment in time in late January. I think it shows clearly interdependence and kind of the hallmark of a single conspiracy this court has found in its cases. At this point, I'm going to ask my co-panelists if there's anything at all that they wish to question you about on the remaining issues. You've talked about the multiple conspiracy issue, and you've talked about the wiretaps. And at this point, I want to ask if my co-panelists have questions about anything else. I do not. All right. We don't have any further questions. I'm happy to submit in the brief, then. Thank you, Your Honor. All right. Ms. West, do you have some rebuttal time? Thank you, Your Honor. To address a couple of points as far as the wiretap goes, it's Joint Appendix, page 1810, paragraph 113, that talks about MATA's counter-surveillance. And it's Joint Appendix 1776, where case agents have attempted to develop confidential sources, but they never tell us how they tried to develop those confidential sources. With regards to- Ms. West, I'm going to brag a little bit here since we are on the record. In 19 years of issuing search warrants and wiretaps, I only rejected one. And within less than 24 hours, the agents came back and I issued it. It wasn't even recorded as a rejection. I just pointed out a couple of things that I thought were missing, and the agents went and fixed it. So your argument, I understand your argument, but the problem is you're never going to be able to make that argument to a district judge before he or she issues the warrant. Which is why what you do in this case is so important. No, I'm not so sure I agree with you. We got a record here that you're swimming upstream against. No kidding. Judge Titus looked at this warrant, these warrants, these applications, and again, I don't mean to criticize your argument, but you're picking through it. You can always find something the agent didn't say, always. I know, but I can find 10 things in this affidavit. You can find 28 things. But here's the problem. Statistically, congratulations on a good 19 years. That's great. I'm only bragging on the one. I said, I'm not bragging on 19 years. The problem is, I want to say in the last, I read some statistic where in the last 10 years, out of 3,900 wiretaps that were taken before district judges, only six out of that 3,900 were rejected. And I say to myself. That's my point. There are more than that. There are more than that. Those are the rejections that get counted in the data. There are more than that. And for me, the problem with this case is my experience as a federal prosecutor. When I used to do these wiretap affidavits, and I used to say, OK, DEA, what'd you find in the trash runs? And I'd make them bring in bags and put them on the conference table. And we'd sift through it together. And what did the poll cameras show? I didn't have any of that in this case. And I'm scratching my head saying, what do people in Maryland do? In Texas, we do everything. DEA here is not doing anything. Maryland has the best US Attorney's Office in the country. I can tell you that. OK. All right. I'm going to go with that. Another point with reference to what my friend at the opposite table here said is these later affidavits said this, this, and this. The problem is it was later, later, and later. Each affidavit has to stand on its own legs and have probable cause and necessity each. I thought he was responding to one of the arguments you all made in the briefs that every affidavit was the same. It's boilerplate. You're cutting and pasting. And he's pointing out, no, they changed as the investigation developed. And you can just see that. They changed a hair here and a hair there. But if you line them all up together, it's the same language in every one. And I want to distinguish for the court our case against the Galloway case that, as he said, came down after we had written our brief. In that case, the court reasoned the affidavits detailed at length the steps that police officers had taken. And what's important about that is it's specific to those facts. And that's what we're looking for here. There were extensive discussions of why the defiance believed the wiretaps were necessary, addressing at least 10 alternative investigatory procedures, such as they affixed GPS devices to all the cars. That wasn't done in this case. And if this was post-Jones, they had to have a warrant to do it. But those methods failed to reveal the full scope of the organization. Well, that's going to be true. We'll never know, because of the size of a drug case, the full scope of that organization. And that's why the affidavit must contain facts specifically detailed to this case. Finally, I just want to talk about my good friend Rob Kerry wrote this book, Not Guilty, about the prosecution of Ted Stevens. I sat through that case and watched it. And if courts don't say you have to give over Brady evidence so that we all have a level playing field, we're just going to keep hitting our heads against the counter for no specific reason. And I'm going to keep doing it so that people like Mr. Steele get a fair trial and can use evidence that's exculpatory. If a dog doesn't hit on a car, there wasn't any drugs in that car. That's exculpatory information. But the jury heard that, right? That the dog didn't alert to the car. Well, what Kyle's versus... No, I understand you wanted more. But that point that you just made, the jury heard. I just wanted to be effective. I'm asking somebody who doesn't know anything about a dog, well, did the dog hit on it? No, I don't know. I'd have to, you know... Armagos knew nothing about that. I'm sorry, but you weren't asking, did the dog hit on it? And he said, I don't know. Or am I wrong about this? I thought the jury heard the dog did not alert to the car. No, the jury didn't... Okay, that's all. That's my only... Your Honor, you're correct. But the transcript shows, you know, I called Armagos... You had more questions about the significance of that failure to alert that you couldn't get answered. I understand. And that's what the confrontation clause says. Not only do you get to confront, but let's make it constitutional. Let's do it effectively. Ms. West, question. Yes, sir. Isn't it true that a drug dog, a canine, will hit on a car that has drugs in it even though physically there's no drugs in the car at that time? Answer, I don't know. I'm not a canine handler. Is that effective advocacy? I don't think so. All right. Thank you very much. Yes, Your Honor. I'd like to thank... I see each of the three of you are court appointed. And I want to thank you each for taking the case and doing such a fine job with it. We really rely on you.
judges: J. Harvie Wilkinson III, Pamela A. Harris, Andre M. Davis